2011-12-96 Mr. Veech will be ready when you are. I'll start, Your Honor. I'm pleased to report to Carson Veech on behalf of INTERMEC Appellant. I'm with me today, Jake Coring from Pre-Warning Peters and Pavel Maltsev, in-house legal counsel to INTERMEC. As I'm sure Your Honors are aware, there are five patents that issue in this appeal, and the construction of certain terms within them and the nature of some of the evidence below. So I'm going to move directly into these claim terms, given the limitations of time. The first patent I'd like to talk about is the 947 patent. Did I correctly count nine or ten claim construction issues you're appealing? That's correct, Your Honor. Now there's a fair amount of overlap between some of them. They're going to be selected this morning. I'm going to be quick. Thank you, Your Honor. By way of example, the 947 patent and the 971 patent both involve handheld devices, which utilize data capture or an optical means to obtain information and images and to take those images into a microprocessor and also to display them. And that's the 947 patent has a screen size limitation. The 971 patent is distinguished by having not a screen limitation but rather a multitasking operating system claim. The term at issue in the 947 patent is optical reader means for effecting the input of optical information. There's a dispute between the parties about whether means plus function should apply here. It's covered in the briefs. I don't think we need to discuss that. Mr. Beach, what I'd like to hear about is the first style and second style holding of indifference. Okay, Your Honor, I can do that. That involves the 678 patent. And the 678 patent involves a system for distributed computing between terminals and servers. And the first style and second style was held indefinite by the district court. I would refer this court to the Kyrstia v. ITC decision where the concept of the term different is discussed and the decision cited therein and that the use of that term does not render something indefinite. In terms of the first style and second style, what I would point out is that one, both experts from each side said they understood in the context of these patents what style meant. They understood what it meant, but was there any evidence there was any difference between the first and second style? Yes, Your Honor. Wait, wait, wait. Other than the context in which it's used? Yes, Your Honor. The specification contains some guidance on that. And in particular, at column 10, lines 34 to 41, the style of the server is described as commercial database management systems and it lists several types of those systems. At column 8, lines 27 to 29, the terminal style is discussed as tabular and in a SRAM. So there is guidance in the specification itself as to what sort of style, as to what the difference is between these styles. And in fact, it's fairly obvious, particularly the one of ordinary skill in the art, because servers have got the capacity to store much more data and to store it in a different fashion than can be stored in a small handheld terminal. And that's the whole purpose of the patent, is to distribute the processing between a server and remote terminals, which allows a terminal to obtain information from the server on an ongoing basis and in essence, utilize the information that is there. And so, to one of skill in the art, the kinds of memory storage styles that you would use on a server are different than the memory storage styles you would use on a small handheld device. And guidance for that is at those citations in the specification. And so, a potential infringer would have the ability to read that specification, reference the sorts of memory styles and systems that are referenced there, and understand what they should not be doing in terms of infringing this patent. And so, therefore, I believe that it meets the standard of definiteness, because of what's in the specification and what one's ordinary skill in the art would understand these terms to mean. To move back to the 947 patent, it is our contention that the construction photoelectric sensor array with a light source and decoding logic imported two limitations to the claim that are inappropriate. The decoding logic and the light source. First of all, decode and decoding words are never used in any of the claims. Second, the decode and decoding words that are used in the specification are not used in the relationship to the input of optical information. And remember, the term here is an optical reader means for affecting the input of optical information. They are mentioned a few times, but as I said, they never mention in relation to the input of optical data. Rather, they only appear in relationship to something that might happen after the microprocessor... If you were to conclude that part of the processing in these handheld devices was necessarily included the ability to decode barcodes, you lose on those claims, right? Well, I'm not so sure that that's correct. We might lose on that claim for the accused products because they're older, so that's a possibility. But I think what the specification shows, and particularly in... Wait, I don't understand your answer to my question. I'm saying with respect to the 747 and 971, that if we construe these as requiring the capability of decoding barcodes in the handheld device, you lose with respect to those claims, right? I believe that's correct, Your Honor. That's correct. But I would contend, Your Honor, by looking at Figure 18, that the decoding of logarithms that are referred to there are referred to as something that happens optionally after the microprocessor receives the image and clarifies it. And that's what Figure 18 shows. And I think also a critical reason why this claim term should not include decoding is that the specification itself says that the optical input system should be able to capture graphical information, text, barcodes, and gives examples it has of figures that show Chinese characters, has figures that show signatures that have been captured and are displayed. You don't need any decoding of logarithms for a signature, for text. Well, that may be, but the fact that it can pick up a signature or Chinese characters doesn't mean that it doesn't have to be able to decode barcodes. The fact that it can do other things doesn't mean that it doesn't have to have the barcode decoding capability. Well, Your Honor, I would contend that decoding logic is not part of the invention. That is something which the invention is the capture of optical information and the display of it on a handheld device with a certain screen size. But that's what the invention is here. And that, you know, decoding logarithms, the same thing as, for example, if you had a translation logarithm that would allow you to take the Chinese characters and translate them into English. But these are optional things which could be grafted onto the invention and so therefore they show the utility of the invention. But they're not things that are required by the invention. And again, I would say that they're not showing you in the specification that you need to have the ability to translate the Chinese characters into English. They're just showing you the kinds of things that can be displayed. That's the invention. And the decode is an optional sort of thing afterwards that can increase the utility of the invention. The same thing with the 971 pad. I would say that the decoding is not part of the invention. The invention is the grabbing of the optical information, the displaying it, and being able to have a multitasking operating system on that handheld device. Those were the inventions here. These patents are not recent patents. They go back a long ways. And so those were the inventions. And decoding is an example of what you could do with the graphical information once you've obtained it. That's one example of what you could do with it. You could compare signatures. You could decode it. It was a barcode. You could translate it if it was a language. All of these things are possibilities, but they're not what the invention is. So I think it's an invasion, if you will, of the invention, a limitation, improper limitation of the invention, to add the decoding to it. The same with the light source restriction. Your Honor, there's nothing in the claim language of the 971 that requires the light source. The 947 has two dependent claims, 10 and 17, that claim a light source on the device. The independent claims don't. And so the patentee, he knew how to claim a light source if they wanted it. There's a figure that shows a shell module with a light source in the 947 and the 971. There's also one diagram that shows that you could have one embodiment that could include a flash, like for a camera. But there are other embodiments, like figures 2 and 7, I believe, that clearly don't have any light source attached to the device. So I think the light source, again, is an improper limitation on the 947 and the 971. Multitasking operating system, the court construed that to... It didn't have anything to do with the judgment, right? Well, you're correct, Your Honor. She did not reach that, but we believe her construction was wrong. She's like an advisory opinionist. Well, she certified it under Rule 54, so it's not... I just don't want to come back again. Under Rule 54, she doesn't certify every decision she made. She certifies a judgment. Well, that's true. That's true, Your Honor. You are into your rebuttal time, which you wanted to save, and you can continue or save it. I'll make one more quick point, which is on the communication means of the 678 and 645. The court below restricted those to an RS-232 serial interface. That limitation is incorrect. I think if you look at the figures in the patents, you'll see that they, as the court properly ruled, that the software and hardware inside the server and inside the terminal are not part of the communication means, and the RS-232 is on software that resides inside the terminal and inside the server. And further, the spec makes mention of numerous other protocols, IBM protocols, incorporates patents that have multiple other protocols. In other words, here again, the invention doesn't include the protocol. The protocol is merely an enabling thing, like an outlet to a toaster. The toaster doesn't work without electricity, but the outlet's not part of the invention. And here a protocol makes the invention, enables the invention, but it's not part of it. Thank you, Your Honor. Mr. Haslund. May it please the Court. Let me just start initially with addressing the last comment, the last argument, which is the communication means. I think the Court clearly identified the structure, and I would just point the Court to column 11, line 15, where in describing the operation, the specification says this. Initially, step 166 calls the radio protocol stack 160, whereby access is made through the UART, that's the Universal Asynchronous Receiver Transmitter, which is the RS-232 in the diagram. See figure 3. To the module 152, turning module 152 on to transmit the SQL request to the transceiver 14. That's precisely what the function of the claim is, which is communicating between the radio receiver on the remote terminal and the radio receiver on the server. And that's what that specification and the other sites that the Court gave, which clearly link the RS-232 connection, shown in figures 3 and 7, to the function. Okay, perhaps that's subtle, but you have a bit of a problem with respect to the 499, which doesn't use communication means but uses communication systems. So I'd like you to address that claim construction with respect to the 499 and then at some point deal with application programs. Those seem to me to claim constructions which raise some significant questions. And the second one I missed. The meaning of application programs, but it has to be executed. Okay. First of all, on the 499, she did not construe that as a means plus function element. Right. So why? Why is there no infringement? Yeah. Because it seems as though all that's required is a transceiver, and there's a transceiver here. Well, the claim system is a radio transceiver on a remote device and a radio transceiver on a server communicating together. The infringement read was on a Palm cell phone, which connects to a radio receiver wirelessly to a cell tower in the cellular network. The call is processed through the cellular network, going through the cell tower to a base station controller, ultimately passed off from the cellular system to the Internet, all wired to somewhere on the Internet to a web server that the remote terminal was trying to access. There was no showing that the remote server had a transceiver in it. There was no evidence on that. They were basically simply saying, look, there's a RF link between the cell phone and the initial cell tower, and that meets the claim. Nothing, and the court was clear on this in its opinion, no evidence that wherever that remote web server was, Why does the web server have to have a transceiver? Because it has to communicate. The claim was that there's a wireless communication link between the remote terminal and the server via transceivers. That was the claim construction, which is consistent with what the patents are all about. These were patents which, remember, the entire specification is about a system to be used in a warehouse or in a very local environment where I could walk around in a warehouse using a barcode reader to read barcodes and have that information automatically passed back for inventory control. The court basically said their attempt to map that onto the cellular system, then connected to the internet, was just a bridge too far. Okay, how about application programs? The application programs are programs that the court said had to be operated by a microprocessor. There was no dispute among the experts that microprocessors operate on instructions in micro-instructions or machine language instructions in binary form. That there was no dispute on. It's admittedly extrinsic evidence, but it's extrinsic evidence supported by the specification which said that the microprocessor operates, is the one that executes these programs, these application programs. The infringement argument was that a device, again, the handheld cell phone, when it goes, when it has a browser and goes to get a webpage, that that somehow meets the definition of the application program. Because what they get from the webpage is in an executable form. It's a JavaScript, but it is not the application program of the browser. The browser resides entirely on the device. It is just a piece of data that comes with JavaScript which tells the device how to render it. It is not machine instructions operated by the microprocessor. I want to just touch briefly on the argument on the 678 and particularly on the indefiniteness question that the court asked. I think the problem with that claim as found by the judge is it is boundless. Even if you accept that there is some discussion in the specification of a particular way, one way of determining what the difference is, the claim isn't limited to that. The claim is boundless. The testimony of the experts was, it could be anything. It could even be, for example, storing something in 8-bit words in one place and 16-bit words in another place. The other thing that the court focused on is that the claim language is inconsistent with the abstract in how it describes the first style and the second style. In the abstract, the memory on the remote terminal says that it stores it in the second style, the dynamic addressable memory, which is clearly linked and is clearly talking about the memory on the remote terminal. The claim requires that the device operate, the road terminal operate, on data in the first format style. So the court supported its argument on the indefiniteness of that by finding that the claims in the specifications don't even match as to how they refer to the first style because the specification says information is stored in one style on the remote device. The claim requires that it operate on information in a different style. So I think the court was correct in saying it is not only boundless, but if I look to the specification, I find inconsistency in the specification and that supports the indefiniteness finding. Finally, I want to go to the optical reader means. I want to step back first and put in context what the infringement claim here is. The infringement claim is that a Palm cell phone that has a camera, when it takes a picture of a barcode, meets this limitation. Even though when it takes the picture of the barcode, it may not have captured the entire barcode, it may have overexposed, it may have been taken in too little light and you can't see the barcodes, but that's what they claim is the optical reader means for inputting optical information or the indicia reader input system of the claims. And that is clearly not what these claims are talking about. Both the 947 and the 971 are talking about data input systems through a processing module. The claims are talking about getting information into the system. If you look at... Isn't that enough for the camera to capture let's say a barcode image and that's data input into the system or is there a requirement for further... There's a requirement for further processing. And that's clearly made the specification as the court pointed out in columns 16 through about 24. What is very telling is the portion of the specification, I think it's in column 17, where it says that this patent is to be an improvement on the 057 and the 425 patent. Later on it incorporates by reference and refers to the 949 patent. The 971 I believe just basically incorporates the 699 patent. All of those patents talk about it, particularly the 057 and the 425, talk about good and bad reads. What they're talking about is that the image taken is good enough or it's not good enough. And the incorporated patents talk about if it's not good enough you will get some sort of a signal indicating you have to take it again. And the reason you have to take it again is if it doesn't capture it well enough it can't interpret it. So a picture of a barcode entered in as a picture on my POM cell phone doesn't allow the cell phone to do anything with that barcode other than say here's a picture of a barcode. And you might look at it and say well I can't see anything in there. I say it's a picture of a barcode. Not on the POM. Not on the accused's devices. It's a picture. There is no way to take that picture and process it to get the information out of it. And if you look at figures 13 through 17 in the 947 patent it's talking about the ability of the system to be able to see the curves and when the curves inflect and what the width of the lines is. That is processing or decoding of some sort. Even if you don't accept the argument that it goes on to derive what the number or information is stored in the barcode, the patent clearly indicates that part of the input system is to be able to see the inflection points. Determine exactly when the white ends and when the black lines begin so that you will be able to get a clear indication of what the barcodes are. Let's go back a little bit to the communication means elements of Claim 8 and back to the discussion regarding the RS-232. What's your response to your opponent who says that the RS-232 is not necessary because the reciter functions don't require a communications protocol? It's a means plus function element and you do have to get the structure. A protocol is just a method for how you will send information. But a communication protocol... But information without sending it is not... Communication means sending it. It's talking about transmitting. The claim limitation is communication means for transmitting data between the server and the terminal. Having a communication protocol that says when I prepared my argument last night and was going over it that's a protocol. I was going through the protocol I was going to use here today but until I get here today... A communication protocol is what enables one device to talk to another. And the device shown in the patent is the RS-232 in Figures 3 and 7 and the specification says that's what permits the communication. But the claim requires its communication means for transmitting data between said server station and each of said plurality of client data collection terminals. This is an apparatus claim. It's talking about a piece of apparatus that permits the data to be transferred. It can be transferred in various protocols. I can transfer it in several different ways, several different protocols, but it has to go over some piece of structure and the court correctly based on the specification of the figures found that the structure was, as disclosed in Figures 3 and 7, was the RS-232 linked between the RF means and the server on the one side and the RF means and the terminal on the other side. If the court has any further questions, I'd be happy to answer them. Otherwise, I'll not use up all my time. Thank you, Mr. Haslam. Mr. Veach has a little more than two minutes. Thank you, Your Honors. I'd like to address just a couple of the points that were made, Mr. Haslam. On the communication means, I cannot emphasize too much. Numerous protocols are in the specification. Column 4, Line 11 to 14, describes IBM's distributed data management protocols to be used. They are incorporated by reference patents that have examples of other RS protocols. The protocol enables the invention, but it's not part of it. It's not part of the communication means. On the 499 patent, the communication means is as the court said, it is the wires and if you take a look at the figures in the patents, you have servers and you have terminals. They are connected to transceivers and they connect to each other both through wired and wireless means. Figures all contain some wired elements, some wireless elements. So the communication means are those wires and transceivers and wireless elements that are outside of the server itself and outside of the terminal. So I don't think it's indefinite at all. I think the court was correct in describing it as that. I think the mistake the court made was by including the protocol which resides on the software inside the terminal and inside the server as part of it. Because multiple protocols could be used. As long as you've got the same protocol on each end, it can communicate. So multiple ones are in the spec, multiple protocols. On the 499 patent, the evidence is, there's significant evidence. Intermex expert took the Q's devices. He sat and connected to the Freeborn and Peters server. That's sitting at Freeborn and their own 30B6 witness testified that the Q's devices communicate with servers wirelessly and that the server is connected at some point to a transceiver is absolutely necessary. Otherwise, it could never receive the communication from the terminal. So I think that there was the court blow erred in looking at the evidence and there was substantial evidence and summary judgment should not have been granted on the 499. Lastly, the processor part of the claim. Communication means, processor means that if you look at the figures, the processor means at most, it cleans up the image. It doesn't decode. It cleans up the image to make it sharper. I see my time has expired. Thank you very much. Thank you Mr. Veach. We'll take the case under advisement.